**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| STEVE BLAKENEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.: 4:15-CV-00373 |
| v. | ) | |
| | ) | |
| CITY OF PINE LAWN | ) | |
| and | ) | |
| BRIAN KRUEGER, | ) | <u>Plaintiff demands trial by jury.</u> |
| | ) | |
| Defendants. | ) | |

**<u>FIRST AMENDED PETITION</u>**

**<u>COUNT I</u>**

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for Count I of his First Amended Petition against Defendant, City of Pine Lawn (hereafter referred to as "Pine Lawn"), states:

**I.**     **<u>Initial Employment.</u>**

1. Blakeney was hired in April 2010 as a probationary policeman by Pine Lawn after he was certified by the state of Missouri.

2. Blakeney was awarded the Medal of Valor in 2010 for his work at the Pine Lawn police department.

3. Blakeney received the Distinguished Service Medal for his work for the Pine Lawn police department in 2011.

4. Blakeney received the Chief's letter of Commendation while working for the Pine Lawn police department in 2011.

5. Blakeney was promoted to Corporal in the Pine Lawn police force in 2011.

6.   Blakeney was promoted to Sergeant in the Pine Lawn police department in 2012.

7.   Blakeney was given the responsibilities of Commander of Operations and Criminal Investigations in 2012 for the Pine Lawn police department.

8.   In May 2013, Blakeney received the Mayor's letter of commendation to the Attorney General's Office for his police work.

9.   In July 2013, Blakeney was presented with the Chief's letter of Commendation in Creve Coeur, Missouri for his police work.

10. Blakeney received the Sheriff's letter of appreciation in Jefferson County, Missouri in October 2013.

11. The Missouri State Investigator Association awarded Blakeney "Investigator of the Year" for 2013-2014.  The award was given at a conference awards dinner in May 2014.

12. Blakeney was promoted to Lieutenant in May 2014, and he became the Deputy Chief in charge of Pine Lawn police day-to-day operations.

13. At the time of Blakeney's last promotion, he had not had any pending written employment disciplinary actions while working for Pine Lawn.

## II.    Cooperation with the FBI in their investigation involving government officials working for Pine Lawn.

14. Investigators with the Federal Bureau of Investigation ("FBI") approached Blakeney in the late summer of 2013 and requested information regarding illegal activities by government officials working for Pine Lawn.

15. During 2013, and continuing to the present, Blakeney supplied pertinent information to the FBI regarding corruption by officials working for Pine Lawn.

16. Blakeney's information provided to the FBI, which they cleared to be disclosed herein stating that this disclosure would not affect their prosecution, included, but was not limited to, the following:

  a. Blakeney provided information possibly leading to the identification of key witnesses in an alleged extortion schemes involving the Mayor of Pine Lawn, Sylvester Caldwell (hereafter referred to as "The Mayor").

  b. The Mayor had his driveway paved and porch repaired at the same time that Pine Lawn paid to repave the road in front of The Mayor's house.  There were approximately 65 other houses along the street that did not get their driveways and/or porches repaved at that time by that contractor.  In addition, for the 2 days that the cement dried in the driveway of The Mayor's house, The Mayor required a Pine Lawn police officer to sit in his squad car in front of his house so that nobody would walk through the cement while it dried.

  c. The Mayor had people summoned to court by police officers after he observed some alleged violation that they committed.  Many of these people were consistently the same individuals and he referenced them as the "bitter bunch".  Many of the people were believed to be past political adversaries or citizens that publically criticized him.  The Mayor frequently called for the arrest and summons of citizens on the police radio before switching to a new dispatch service.  After switching radio dispatch services, he was banned from utilizing the police radio but still called Pine Lawn officers when he wanted to have someone arrested.

  d. The Mayor ordered video and still footage of political adversaries who were arrested, by an outside person.  The Mayor used the photos in a later campaign ad with

the "Pine Lawn Evening World".  The Ad/Article in the paper discredited past and future political candidates pictured in various states of arrest.  Some were leg shackled for the photos.

e. The Mayor asked for an arrest warrant during the time period of his last election to arrest the opposing candidate on a minor offense that would normally require only a ticket.  Media outlets were then contacted advising them of the arrest of The Mayor's adversary.

f. The Mayor would secure the release from jail or dismiss charges against certain individuals who were believed to be known supporters of The Mayor.

g. On one particular occasion, The Mayor obtained the release of an individual from the jail.  The Mayor then gave beer to the individual who was released because it was past the time that individual could obtain liquor.

h. The Mayor, on several occasions, had on-duty police officers stationed overnight in their squad cars to watch his D.J. equipment when he left it in the city community center.  The officers were stationed at both entrances to make sure that his personal equipment was not stolen during a burglary.

i. The Mayor had police officers act as personal security outside of the Pine Lawn jurisdiction while on duty, while he was working at private events (non-city business) at the Ambassador in North County and in other venues.

j. The Mayor used a city public works van to transport his personal D.J. equipment to events.

k.   The Mayor visited various markets and shops located in Pine Lawn.  The Mayor removed items but did not pay for them stating that they would be added to his tab.

l. The Mayor requested Pine Lawn employees to pump gasoline in his vehicle at gas stations so he wouldn't have to get out of his vehicle.

m. The Mayor asked Blakeney to buy The Mayor's lunch or dinner on pay day on many occasions.  Blakeney was  requested to get a boss's day gift every year and he had to supply  2 large bottles of cool water cologne on The Mayor's birthday and father's day each year.  Blakeney had to supply a box of pizzas from a family friend's business each month.

n. The Mayor had ordered other officers to stop and frisk people for positive confirmation of their identity if they were within a certain range of his house in Pine Lawn, such as a cable repairman.  Blakeney reported this to The Mayor as unlawful stops but it never ceased.

o. The Mayor ordered vehicles towed under any circumstances of arrest, even if the vehicle was safely and legally parked and the arrested owners consented to leaving the car parked on the street.  The Mayor evaluated police officers performance based on the number of vehicles they towed during their shift.

p. The Mayor mandated that each police officer write at least 80-100 tickets per month rendering totals of up to 1800-1900 summons/tickets during some months during the summer.  The Mayor reviewed these numbers monthly and stated that they were needed to pay the "office salaries", including the Mayor's salary.    The Mayor's salary was increased to $60,000 as a full time job after he was just elected to office.

q. There were Pine Lawn employees called the "neighborhood watch" whose job was to only watch The Mayor's house 24 hours per day after a brick was thrown through his window during his last election.  It cost the city many thousands of dollars until it was ceased for budgetary reasons possibly because of the immediate elimination of speed cameras.

r. The Mayor frequently referred to the police department as his "private army" and "his" police department.

s. During the last state audit of Pine Lawn finances, it declared The Mayor's city vehicle use excessive in its public release.  The Mayor then obtained the use of 3 city vehicles, alternating them out daily to not place too many miles on any one vehicle.  The Mayor declined to have the county GPS new radio system placed in his city vehicles, as required.  The radios allocated to his vehicles from the county were placed and installed in non-operable retired police junk cars.

t. Blakeney questioned the City Manager, Brian Krueger (hereafter referred to as "The City Manager"), about using state training funds for Pine Lawn general revenue when those funds were not given to Pine Lawn for its General operations.  The state gave Pine Lawn training funds that were designated for certified police training and supplies.  Blakeney questioned The City Manager about the misuse of the funds for other purposes and the legality of those actions.  Blakeney also reported this to the State authorities.

u. Blakeney also informed the FBI regarding numerous retaliation actions harassment and intimidation after Pine Lawn learned about Blakeney's actions as a witness of the corruption.

III.   **Events leading up to The Mayor's arraignment.**

17.     In May 2014, Blakeney was promoted to Lieutenant and Commander.  The Pine Lawn prosecutor, Anthony Gray (hereafter referred to as "Gray") was placed into the position of Director of Public Safety, "Chief of Police", and the direct supervisor of Blakeney.

18.     Michael Brown was shot by Ferguson police on August 9, 2014.

19.     Gray became the Brown family Attorney even though he was the administrative head of the Pine Lawn police department (chief of police).  The Pine Lawn police department was the leading assisting agency (first assisting department on the scene) to the Ferguson police department for riot control. During the first incidents. Pine Lawn supplied up to 10 officers.

20.     On September 26th 2014, Blakeney was informed that The Mayor was indicted by a grand jury and arrested for the charge of extortion.

21.     During the week of September 26, 2014, Blakeney held a police department meeting to address The Mayor's indictment.  Blakeney's supervisor, Gray, was asked to attend the meeting so that they could answer the officers' questions.

22.     When arriving in the meeting room, Blakeney was met by Donnell Smith, the City Attorney and Lou Thymes. The individuals had not been informed about the meeting nor invited to the meeting.  Donnell Smith told the officers at the meeting that The Mayor was still in charge, and they were to follow all his directions.

23.     On September 29, 2014, The Mayor was arraigned in federal court and no special restrictions were placed on him regarding the operation of activities at Pine Lawn.  Gray told Blakeney that The Mayor "is still in charge and it is business as usual".

**IV. Events after The Mayor's arraignment.**

24.     On or about September 29, 2014, Gray told Blakeney about numerous statements made by The Mayor to Gray.  The Mayor stated that he believed Blakeney to be celebrating his

indictment, and was up to no good and accused Blakeney of trying to take The Mayor's name off the police cars, and accused Blakeney of removing boxes and paperwork from the police station to further The Mayor's indictment.

25.     On or about September 29, 2014, Gray told Blakeney that without special instructions from the federal court after the indictment, "moves could be made on me". Blakeney took that as a threat and as retaliation by The Mayor.

26.     On or about September 29, 2014, Gray was given the responsibility for control of daily operations of the Pine Lawn police department. Blakeney had his police department computer clearance taken from him.

27.     On September 30, 2014, after the aforementioned department meeting and conversations with Gray, Blakeney's attorney sent correspondence to Pine Lawn citing the whistle blower protection rule offered to him as a senior police officer.  A copy of this correspondence is attached and incorporated as Exhibit A.

28.     On or about September 30, 2014, after the correspondence was provided to Pine Lawn, The Mayor told Gray to "watch Blakeney". Blakeney was stripped of operation control for the police department.

29.     On October. 10, 2014, Blakeney's prior responsibilities of making statements to the press regarding department issues were restricted.

30.     On October 16, 2014, a picture of a rat was placed on the outside of Blakeney's office door.  A copy of the picture is attached and incorporated as Exhibit B.

31.     Blakeney notified Gray, The City Manager and The Mayor about the rat picture being placed on his door.  Blakeney asked for an investigation.  The Mayor told Grey that it was merely a "Halloween decoration". The City Manager informed Blakeney that the department

station camera that would have identified the person who placed the rat on the door was "inoperable." No other actions/investigations were taken to stop the ongoing harassment that Blakeney was receiving.

32.      On or about October 20, 2014, The City Manager authorized spending approximately $9,000 out of approximately $15,000 State of Missouri training fund check to pay for an Auto Tire mechanic bill. Blakeney advised Pine Lawn officials that he believed the actions to be criminal and to return the money.  The funds were to be used for civil disobedience training and supplies during the Ferguson protests.

33.      Blakeney contacted the State authorities, and then met with the Prosecuting Attorney's office executive assistant, and advised them of the incident. The City Manager and Blakeney's supervisor were aware of Blakeney's reports to the state of suspected illegal activities.

34.      On October 28, 2014, Blakeney received a summons to attend a board meeting that was to take place on the following day, October 29 at 5:30 pm to discuss "personnel issues." No other information was provided to Blakeney regarding the board meeting.

35.      On the morning of October 29, 2014, a person, who was not employed by Pine Lawn, told Blakeney's legal counsel that the later board meeting was scheduled to terminate him. Blakeney was also told that a particular Pine Lawn employee disclosed Blakeney's personnel information to the public at a domestic hearing in Jefferson County, Mo.

36.      Blakeney requested Gray and The City Manager to provide additional information about the board meeting and he requested that any charges made against him be provided to him in writing as required.  After Blakeney asked for the additional information, he received notice that the board meeting was canceled.

37.     Blakeney requested Gray and Donnell Smith to perform an investigation into the employee who released his personnel information to the public.  No investigation was performed and no action was taken regarding the employee who released Blakeney's personnel information.

38.     On October 30, 2014, Blakeney was offered six months' severance pay to quit the police department if he signed a release of his rights to seek further action against Pine Lawn. Blakeney rejected the Pine Lawn offer.

39.     On November 2, 2014, Blakeney sent correspondence to Donnell Smith, the city attorney, asking that the hostile work environment cease, and asked that certain administrators who were acting maliciously towards Blakeney stop these actions. Blakeney received no response from Donnell Smith.   Although no one was identified in the letter, the City Manager responded stating if Blakeney "wants to talk about my veiled accusation directed at him, the ball was in his court".

## V. Events before the announcement of the Grand Jury Verdict on the Michael Brown shooting.

40.     On Thursday, November 20, 2014, Blakeney spoke with Gray about Pine Lawn police resources that would be committed to Ferguson when the Grand Jury meets Monday, November 24, 2014 and the Grand Jury verdict is released on the Michael Brown shooting. Gray told Blakeney that he wanted no Pine Lawn police officers in Ferguson. There was a mutual aid agreement and Pine Lawn officers had received months of training and had received some supplies to assist the Ferguson police department with any problems after the indictment would be announced. Blakeney questioned the legality of Gray's conflict of interest as Pine Lawn Chief of police and the Brown family attorney.  Blakeney was told there was no conflict.

41.     Pine Lawn officers had been working in Ferguson since August 2014.  The Pine Lawn police department had received riot training and approximately $15,000 for training and supplies that were earmarked for this task.

42.     On November 20, 2014, an emergency board meeting was posted at approximately 10:05 pm.  The Notice called for the meeting to take place on November 21, 2014.

43.     On November 21, 2014, another letter was sent from Blakeney's attorney to Pine Lawn advising them of improper procedures and obvious hostile tactics created to terminate Blakeney, without cause in front of the board.  Gray was also advised of the improper posting of meeting, in regards to date and time, and its placement of said meeting, required by the Missouri Sunshine Law.  A copy of this correspondence is attached and incorporated as Exhibit D.

44.     On November 21, 2014, after Blakeney left the police station at approximately 5:00 pm, The City Manager posted signs around the police station that stated Blakeney was not allowed in the building or on City property.  A copy of the sign posted by The City Manager, before the board meeting even took place, is attached and incorporated as Exhibit C.

45.     On November 22, 2014, a board meeting was held to discuss Blakeney's employment.  Prior to the meeting, Blakeney had not received any response to objections to violations of the Missouri Sunshine Law.  Blakeney never received anything in writing letting him know what he had allegedly done wrong.  Blakeney did not know anything about the meeting other than he was verbally told it was about his employment. Blakeney made compliant with The Attorney General's Office regarding violations of the Missouri Sunshine Law.

46.     Upon Blakeney's arrival to City Hall for this meeting, five armed police officers met him at his vehicle to escort him into the meeting. Two of these officers had pending serious

discipline complaints against them, from Blakeney, where Blakeney requested their termination. Several of these officers were called in to work to perform this act of intimidation. The police officers disarmed Blakeney while he was in his full Commander's uniform. One officer, who Blakeney had requested to be terminated, extended his hand to make contact, because Blakeney was not moving fast enough in the direction he desired.

47.     The City Manager began the board meeting with a list of frivolous charges dating back almost 5 years earlier that had been investigated and dismissed without any disciplinary action taken.   Blakeney had received multiple promotions since those allegations were made almost 5 years ago.  After questioning the improper procedure of getting notice of the meeting and not receiving any written charges, Donnell Smith told the board that "we can do anything we want to do." Donnell Smith also stated Blakeney "created these actions himself, and there was no protection for that".

48.     During the meeting, Donnell Smith stated that Pine Lawn had received a letter from Blakeney's Attorney.   However, Smith did not read the contents of the letter and never provided copies of the letter to the Board.  Smith did not inform the Board that Blakeney alleged improper notice about all the proceedings and had alleged whistleblower protection and harassment.

49.     The board meeting lasted 4.5 hours with questioning by Donnell Smith acting as a prosecutor.   During the meeting, Blakeney was not allowed to view anything and he did not receive any of the documents that were being discussed at the meeting.  Blakeney was given no time to prepare and has never received any of the charges in writing.  In addition, this was the first time over the last five years that Blakeney worked for Pine Lawn that the board meeting was held on a Saturday.

50.     Blakeney asked twice for an independent investigation from an outside agency, and was denied. The issues that occurred 5 years earlier had already been disposed of, and were proven to be unfounded after an investigation, but these issues were presented to the board by Donnell Smith as if they had been just occurred and were still pending.  There was no merit to the prior allegations as Blakeney had been promoted multiple times since those occurred. During the meeting, Blakeney was questioned about authorizing overtime pay for an officer to pick up two females from Blakeney's personal residence on one occasion in November 2014. Blakeney denied the allegation and requested further investigation, which was denied. A general Order at Pine Lawn police departed states that the supervisor who approves the overtime must sign the overtime authorization document. The overtime authorization document shows that Blakeney did not approve the overtime of the officer. Another supervisor signed the document. At the end of the meeting, Blakeney was placed on paid leave. Another letter was sent by Blakeney's attorney to Pine Lawn, see Exhibit E.

51.     On November 24, 2014, no Pine Lawn police officers responded to assist the Ferguson police department, although it had received training and supplies to respond. Pine Lawn police officers had been working in Ferguson since August.  A copy of a photo of supplies, that went unused after the verdict was announced, is marked as Exhibit F.

**Events after Blakeney was placed on leave.**

52.     On November 26, 2014, an Order was issued to the police officers via the desk book that no additional information regarding the police department was to be given to Blakeney or the officer would face discipline up to termination.

53.     On December 4, 2014, Blakeney's pay check was withheld for 2 days and Blakeney was not allowed on City property.  The City Manager, escorted by a police officer, met

Blakeney at a gas station to collect Blakeney's department dress uniform before giving Blakeney his pay check.  Blakeney was requested to turn in all his department equipment including his department car, badge, and guns.  No officer placed on "leave" was required to turn in all their equipment, which was done only after termination.

54.     Blakeney was informed about his termination by individuals working for the local news stations and the newspaper.  The City Manager gave these individuals many documents from Blakeney's personnel file that were never shown to Blakeney.

55.     A few days after the press informing Blakeney of his termination, Blakeney received a letter from Pine Lawn advising him that he was terminated.

56.     The City Manager posted a Memo stating that Blakeney was terminated for meeting two women at a bar and they subsequently "woke up" at Blakeney's home with a loss of memory.  A copy of this memo is attached and incorporated as Exhibit G.

57.     Donnell Smith and the Pine Lawn Board stated that Blakeney was terminated for approving overtime for an officer.  Blakeney was not terminated from Pine Lawn for doing anything improper with two women. The women did not go to sleep and "wake up" at his house, they never had sex, the officer who picked up the women was off duty, and Blakeney was not the supervisor who gave approval for overtime. The City Manager's memo is false.

58.     The various news agencies reported that Blakeney was terminated because of meeting two women at a bar and they couldn't remember how they went back to Blakeney's house, implying that Blakeney had done something improper with the women. This was based upon                                                                                              what Brian Krueger stated in his memo, dated December 15, 2014, that Blakeney was terminated for his interactions with two women. The only reason for termination had to do with approval of an

officer's overtime and his termination did not involve any interactions with the two women. The City Manger's memo is false regarding what the women stated and regarding the reason for Blakeney's termination.

59.     After Blakeney's termination, Pine Lawn would not give him his final paycheck unless he signed a Release of all claims against Pine Lawn. Blakeney refused to sign the Releases and Pine Lawn wouldn't give him his check. After several days Pine Lawn gave Blakeney his final paycheck even though he wouldn't sign the Release. After Blakeney's termination, The City Manager was terminated. After Blakeney's termination, Gray was removed from his position as Director of Public Safety and Chief of Police. Blakeney was not allowed to retrieve his personal belongings.

.     60.     Blakeney's report of criminal violations to third party government authorities and his supervisors was a contributing factor in his retaliatory wrongful termination.

61.     Pine Lawn has procured liability insurance that would provide coverage for retaliatory discharge claims brought against them.

62.     As a result of Pine Lawn's retaliatory discharge of Blakeney, he is entitled to his past and future lost earnings and benefits.

63.     As a result of Pine Lawn's retaliatory discharge of Blakeney, he was caused to suffer severe emotional distress which will continue into the future.

64.     Blakeney is also entitled to punitive damages, attorney fees and costs as a result of Pine Lawn's actions.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, City of Pine Lawn, in the amount of $5,000,000.00 and award costs of suit.

**Plaintiff Demands Trial by Jury.**

## COUNT II

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for Count II of his First Amended Petition against Defendant, City of Pine Lawn (hereafter referred to as "Pine Lawn"), states:

1-59.   For paragraphs one (1) through (59) Blakeney realleges and incorporates paragraphs one (1) through (59) of Count I as though fully alleged herein.

60.    Blakeney was exercising his constitutional right of free speech <u>as provided to him by the State of Missouri,</u> and <u>as such, was performing acts that sound public policy would encourage</u>, and this was a contributing factor in his retaliatory wrongful termination.

61.    Pine Lawn has procured liability insurance that would provide coverage for retaliatory discharge claims brought against them.

62.    As a result of Pine Lawn's retaliatory discharge of Blakeney, he is entitled to his past and future lost earnings and benefits.

63.    As a result of Pine Lawn's retaliatory discharge of Blakeney, he was caused to suffer severe emotional distress which will continue into the future.

64.    Blakeney is also entitled to punitive damages, attorney fees and costs as a result of Pine Lawn's actions.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, City of Pine Lawn, in the amount of $5,000,000.00 and award costs of suit. **Plaintiff Demands Trial by Jury.**

## COUNT III

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for Count III of his First Amended Petition against Defendant, City of Pine Lawn (hereafter referred to as "Pine Lawn"), states:

1-59.   For paragraphs one (1) through (59) Blakeney realleges and incorporates paragraphs one (1) through (59) of Count I as though fully alleged herein.

60.  Blakeney's actions were in accordance with public policy and he was performing a civic duty by acting as a witness in a government investigation and this was a contributing factor in his retaliatory wrongful termination.

61.   Pine Lawn has procured liability insurance that would provide coverage for retaliatory discharge claims brought against them.

62.   As a result of Pine Lawn's retaliatory discharge of Blakeney, he is entitled to his past and future lost earnings and benefits.

63.   As a result of Pine Lawn's retaliatory discharge of Blakeney, he was caused to suffer severe emotional distress which will continue into the future.

64.   Blakeney is also entitled to punitive damages, attorney fees and costs as a result of Pine Lawn's actions.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, City of Pine Lawn, in an amount of $5,000,000.00 and award costs of suit. **Plaintiff Demands Trial by Jury.**

## COUNT IV

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for Count IV of his First Amended Petition against Defendant, Brian Krueger, states:

1-59.   For paragraphs one (1) through (59)  Blakeney realleges and incorporates paragraphs one (1) through (59) of Count I as though fully alleged herein.

60.     Brian Kruger's release of Blakeney's personnel records was an invasion of privacy.

61.     The release of personnel records has led to news reports making misleading and speculative reports about Blakeney.

62.     Pine Lawn has procured liability insurance for the wrongful release of an employee's personnel records to the public.

63.     Blakeney has suffered from severe emotional distress as a result of the release of his personnel records.

64.     Blakeney is entitled to punitive damages for Brian Kruger's actions of releasing his personnel records to various news agencies.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, Brian Krueger, in the amount of $5,000,000.00 and award costs of suit.

**Plaintiff Demands Trial by Jury.**

## COUNT V

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for

Count V of his First Amended Petition against Defendant, City of Pine Lawn (hereafter referred to as "Pine Lawn"), states:

1-64.   For paragraphs (1) through (64), Blakeney realleges and incorporates paragraphs (1) through (64) of Count IV as though fully alleged herein.

65. Brian Kruger is the agent for Pine Lawn and Pine Lawn is responsible for his actions of releasing Blakeney's personnel records to the public.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, City of Pine Lawn, in the amount of $5,000,000.00 and award costs of suit.

**Plaintiff Demands Trial by Jury.**

## COUNT VI

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for Count VI of his First Amended Petition against Defendant, Brian Krueger states:

1-59   For paragraphs (1) through (59), Blakeney realleges and incorporates paragraphs (1) through (59) of Count I as though fully alleged herein.

60.   Brian Kruger published the memo, marked as Exhibit G, by posting it at the station and providing it to various  news agencies.

61.   The memo is false and defamatory.

62.   Blakeney suffered from severe emotional distress as a result of the defamatory remarks.

63. The memo has caused Blakeney from obtaining future employment.

64. Blakeney is entitled to punitive damages as a result of Brian Krueger's actions.

65.    There is insurance coverage that would cover Brian Krueger's defamation of Blakeney.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, Brian Krueger, in the amount of $5,000,000.00 and award costs of suit.

**Plaintiff Demands Trial by Jury.**

## COUNT VII

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for Count VII of his First Amended Petition against Defendant, Brian Krueger states:

1-59.    For paragraphs (1) through (59) of Count VII, Blakeney realleges and incorporates paragraphs one (1) through (59) of Count I as though fully alleged herein.

60.    Brian Krueger knew or reasonably should have known that his actions would cause Blakeney severe emotional distress.

61. Blakeney did suffer from severe emotional distress as a result of Brian Krueger's actions.

62.  There is insurance coverage that would cover infliction of emotional distress.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, Brian Krueger, in the amount of $5,000,000.00 and award costs of suit.

**Plaintiff Demands Trial By Jury.**

## COUNT VIII

NOW COMES Plaintiff, Steve Blakeney (hereafter referred to as "Blakeney"), by and through his undersigned attorneys, Michael Brunton and Brunton Law Offices, P.C., and for

Count VIII of his First Amended Petition against Defendant, City of Pine Lawn (hereafter referred to as "Pine Lawn") states:

1-62.   For paragraphs (1) through (62) of Count VIII, Blakeney realleges and incorporates paragraphs (1) through (62) of Count VIII as though fully alleged herein.

63.      Brian Krueger is the agent for Pine Lawn and Pine Lawn is responsible for his actions for the infliction of emotional distress.

WHEREFORE, Plaintiff, Steven Blakeney, requests that judgment be entered in his favor and against defendant, Brian Kruger, in the amount of $5,000,000.00 and award costs of suit.

**Plaintiff Demands Trial by Jury.**

BRUNTON LAW OFFICE, P.C.

_____/s/ Michael J. Brunton_____
Michael J. Brunton, #42877
Mary M. Stewart, #38594
Brunton Law Office
819 Vandalia (HWY 159)
Collinsville, IL 62234
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2015, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system.

_____/s/ Michael J. Brunton_____